## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| VIRGINIA FRANKLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20 CV 1432 DDN |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM</u>

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Virginia Franklin for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons set forth below, the final decision of the Commissioner is reversed and remanded.

## <u>BACKGROUND</u>

Plaintiff was born on July 15, 1977.  (Tr. 34.)  She protectively filed her application for Title II benefits on March 9, 2018, alleging a disability onset date of November 21, 2016.  (Tr. 63, 136.)  She alleged disability due to migraine headaches, chronic fatigue, chronic pain, left knee arthritis, a left labrum tear, fibromyalgia, "hypermobility," depression, anxiety, and PTSD.  (Tr. 177.)  Her claim was denied, and she requested a hearing before an administrative law judge (ALJ).  (Tr. 76.)

On August 27, 2019, plaintiff appeared and testified at a hearing before an ALJ. (Tr. 29-46.)  On November 27, 2019, the ALJ denied plaintiff's application.  (Tr. 10-22.)

The Appeals Council denied her request for review.  As a result, the ALJ's decision stands as the final decision of the Commissioner.  20 C.F.R. § 404.984(b)(2) (Tr. 1-6).

## ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to her appeal.

On January 27, 2016, plaintiff received her first Botox injection for daily migraine headaches.  She reported teeth grinding and the most prominent pain in the occipital area. (Tr. 707.)

From May 5, 2016, to April 4, 2017, plaintiff received physical therapy at Apex Physical Therapy for low back pain, cervicalgia, and cervico-cranial syndrome.  (Tr. 356-462.)

On September 9, 2016, she underwent a cervical intra-articular injection on her right side at C2-C3, C3-C4 and in the right facet joint.  (Tr. 1171.)  On September 13, 2016, she received a thoracic paravertebral block, a technique where local anesthetic is injected into the space adjacent to the vertebrae to block the spinal nerves, on her right side at T5 and T7 under Rachel Feinberg, M.D., a pain specialist.  (Tr. 1176.)  On October 3, 2016, plaintiff saw Dr. Feinberg for a trigger point injection in the left hip.  (Tr. 1167.)  On October 17, 2016, Plaintiff underwent thoracic paravertebral block on her left side at T11 under Dr. Feinberg.  (Tr. 1158.)

On November 1, 2016, Plaintiff saw Dr. Feinberg for complaints of left knee pain, bilateral hip pain, low back pain, neck pain, headaches, and elbow pain.  Plaintiff described the pain as stabbing, aching, throbbing, burning and numbness.  She reported that bending over, walking, household chores, working, and playing with her children increased the pain. An MRI of the left knee showed significant tricompartmental osteoarthritis.  On exam, she could not extend her knee and had edema.  Dr. Feinberg told plaintiff that if the injection did not significantly change her knee pain, she would need to see an orthopedic

surgeon to discuss partial or total knee replacement or repeat arthroscopy.   Plaintiff received a left knee joint injection.  (Tr. 1150-53.)

On November 14, 2017, plaintiff saw Dr. Feinberg with complaints of pain in the sacroiliac joints due to abnormal gait.  She received bilateral sacroiliac joint injections. (Tr. 1147.)

On November 22, 2016, plaintiff saw Kristen Scullin, M.D., an internist, with complaints of chronic fatigue, hair loss, weight loss, migraines, osteoarthritis in her knee, and depression.   Plaintiff reported she was not functioning and missing work due to migraines. She reported she was not able to do housework or sleep well due to chronic pain. Physical exam showed an overweight plaintiff with a fine resting tremor of the head and neck and a depressed mood.  Dr. Scullin prescribed Dexedrine, a stimulant, for chronic fatigue.  (Tr. 488-91.)

At a December 1, 2016 appointment with Dr. Feinberg, Dr. Feinberg noted plaintiff's bloodwork was very high for Epstein-Barr virus, which she believed could be causing chronic fatigue. (Tr. 1143.)

Plaintiff saw Dr. Feinberg on December 5, 2016 with complaints of chronic fatigue and left hip pain.  Dr. Feinberg performed a left hip joint injection.  (Tr. 1138.)  Plaintiff saw Amanda Dehlendorf, M.D., a rheumatologist, the same day with continued complaints of dryness, fatigue, headaches, joint pain, stiffness, muscle aches and pains, weakness, and back pain.  She had 12/18 tender points for fibromyalgia. The doctor told plaintiff to consider the STEPP program (Solutions, Tools, and Education for Persistent Pain).  (Tr. 1250.)

A December 9, 2016 MRI of her brain showed possible fluid in the left petrous apex, unchanged fluid in the right mastoid air cells, and unchanged foci of T2 hyperintensity in the white matter that favored vasculopathic changes such as migraines.  (Tr. 704.)

During a December 12, 2016 visit with Julie Griffin, nurse practitioner, plaintiff reported dizzy spells and urinary retention making it difficult for her to walk.  She reported feeling a warming sensation before this happened.  Plaintiff had chest tenderness and

- 3 -

reported she could not take deep breaths and was easily winded.  She was referred to a neurologist for dizziness, migraines, and shortness of breath.  (Tr. 493, 497.)

A December 19, 2016 MRI of her left hip showed some fraying of the posterolateral acetabular labrum of the left hip and a somewhat globular superolateral labrum.  (Tr. 546.)

On December 22, 2016, she underwent an initial consultation with Richard Rames, M.D., orthopedic surgeon, for left knee pain.  Exam showed a well-healed scar on her left knee with diffused tenderness about the knee, 1+ patellofemoral crepitus or cracking, and pain with patellofemoral compression.  Left knee x-ray showed mild tricompartmental arthritis.  Dr. Rames diagnosed localized, primary, mild to moderate osteoarthritis in the left knee.  Dr. Rames felt she was too young for any type of joint replacement and suggested ongoing cortisone injections as needed. (Tr. 548-49.)

On December 29, 2016, she saw David R. Curfman, M.D., a neurologist, for evaluation of chronic headaches and possible Botox injections.  Plaintiff reported daily migraines with associated tightness, neck pain, and poor sleep.  As to dizziness, plaintiff reported frequent pre-syncopal sensations, which she described as a sensation of nearly passing out associated with loss of vision and needing to brace herself.  Dr. Curfman opined that the MRI of her brain most likely represented a sequela of her chronic migraines. Plaintiff reported her headaches changed in location and quality.  They were sometimes occipital and other times were frontal, but usually always bilateral.  She reported her left cheek and neck went numb when she had a left sided headache.  She was very sensitive to light and got nauseous with the headaches.  Plaintiff reported she missed work due to her headaches, usually three days a month and sometimes twice per week. She had to stop working due to inability to drive because of pain and dizziness.  On exam, decreased sensation was noted inconsistently in the left face and bilateral legs.  (Tr. 697-701.)

On January 19, 2017, plaintiff saw Dr. Feinberg for headaches. Dr. Feinberg noted pain with rotation to the left and gave plaintiff a medial branch paravertebral injection on the left at C2 and on the right at C6.  (Tr. 1129.)

- 4 -

On January 27, 2017, plaintiff received a Botox injection for her migraines under Dr. Curfman. (Tr. 693.)

At a February 6, 2017 follow-up with Dr. Feinberg, plaintiff reported pain in the right anterior portion of the shoulder with rotation. Dr. Feinberg administered trigger point injections at the right pectoralis major, right pectoralis minor, and right anterior deltoid. (Tr. 1121.)

On February 7, 2017, plaintiff was seen for urinary retention. She was diagnosed with urge incontinence of urine with significant urgency and frequency. She was prescribed Myrbetriq, for overactive bladder, and referred for pelvic floor physical therapy. (Tr. 782.)

On February 20, 2017, she saw Dr. Feinberg with complaints of prolonged intractable headache. Gentle palpation of C2 aggravated her headache. Dr. Feinberg administered a right C2 medial branch nerve paravertebral injection. (Tr. 1116.)

On March 2, 2017, plaintiff underwent a vestibular evaluation with James M. Hartmann, M.D., otolaryngologist, for dizziness, rocking sensation, and spinning since November 2016. Plaintiff described her dizziness as lightheadedness, then progressing to a spinning sensation and occasionally into a blackout. The blackouts were described as her vision going completely black and losing consciousness. This occurred off and on every day with less severity. When she was dizzy, she could not stand up and had to hold onto walls or furniture to walk. The dizziness was triggered by moving from sitting to standing up and when bending over then returning to standing. Additionally, plaintiff reported her migraines had gotten significantly worse in the last year. She reported constant bilateral tinnitus or ringing, constant pressure, pain in both ears, photophobia or light sensitivity, phonophobia, and dizziness with straining. She also reported back pain, neck pain, and migraines. (Tr. 597.)

On March 3, 2017, plaintiff underwent videonystagmography (VNG) testing, used to determine if a vestibular (inner ear) disease may be causing a balance or dizziness

- 5 -

problem.  Testing showed abnormalities that could be indicative of central nervous system deficit or medication induced.  (Tr. 591.)

On March 6, 2017, she underwent trigger point injections into the left sternocleidomastoid area, the left upper trapezius, and the right suboccipital area under Dr. Feinberg.  She tolerated the procedure well.  (Tr. 1112.)

Plaintiff was hospitalized March 10-12, 2017, at Missouri Baptist Medical Center for migraine headaches.  Notes described her as a chronic pain syndrome patient.  Plaintiff described her headaches as throbbing pain starting the back of her neck then moving to the front of her face.  She also had lightning bolt pain in her head at times with nausea, photophobia, light sensitivity, and vertigo.  Plaintiff reported a 70-pound weight loss over the last year and described getting an aura, loss of vision, and then lightheadedness for a few seconds.  She was diagnosed with intractable migraine with aura, status migrainous and received intravenous Benadryl, Zofran, Reglan, and Valium.  (Tr. 607-12.)

On March 27, 2017, Plaintiff saw Robert H. Rifkin, M.D., a psychiatrist, for evaluation and treatment of depression, anxiety, and PTSD.  She reported having gone through a lot of pain and trauma that caused worsening depression.  She discussed her physical problems and that she felt Wellbutrin had worked well for her although the generic brand had not.  Her Prozac was recently increased, and she felt it was starting to help. Plaintiff had a depressed mood and affect with fair insight and judgment.  Dr. Rifkin prescribed Fluoxetine (Prozac); Bupropion; Tryptophan, for sleep; and Valium as needed. (Tr. 729-30.)

At a March 28, 2017 appointment, Dr. Feinberg performed cranial decompression. (Tr. 1108.)

On March 29, 2017, plaintiff was seen at STL Vision for chronic headaches/migraines with vertigo, light sensitivity, and blurry vision.  She reported that even light from the television aggravated her headaches.  (Tr. 630-31.)

On April 10, 2017, plaintiff saw Natalya Rukhman, M.D., an endocrinologist, for a thyroid evaluation.  Plaintiff described decreased energy, cold intolerance, anxiety, hair

loss, difficulty sleeping, and constipation.  She was diagnosed with hypothyroidism and Hashimoto's thyroid disease, an autoimmune thyroid disease.   She was prescribed Synthroid, synthetic thyroid hormone used to treat hypothyroidism.  (Tr. 770-74.)

On April 19, 2017, plaintiff saw Dr. Curfman for a second Botox injection.  Plaintiff reported no response from the previous injection and felt maybe her headaches had worsened since the previous injection.  She continued to have daily headaches lasting all day.  (Tr. 706.)

On May 1, 2017, Dr. Feinberg administered a trigger point injection into plaintiff's left infraspinatus (back of the shoulder) muscle.  (Tr. 1104.)

On May 24, 2017, plaintiff saw Gregory Van Stavern, M.D., a neuro-ophthalmologist, for her chronic migraines.  She had severe light intolerance and had started wearing sunglasses indoors.  Plaintiff was admitted for IV DHE-45 treatment last year, which temporarily relieved the headache, but it returned as soon as the infusion stopped.  Plaintiff reported partial improvement after her second round of Botox injections.  Dr. Van Stavern recommended continued Botox injections for migraines and Fl-41 lenses, glasses used for relief from migraines and photophobia or light sensitivity.  (Tr. 666-67.)

Plaintiff saw Dr. Feinberg on May 25, 2017 with complaints of shoulder and neck pain.  Dr. Feinberg recommended an MRI of the left shoulder.  (Tr. 1100.)

On June 6, 2017, plaintiff saw Dr. Rifkin with complaints of blurred vision and migraines with associated vertigo.  Plaintiff had fair insight and judgment with a depressed mood and affect.  (Tr. 725-26.)

On June 21, 2017, plaintiff saw Barry Feinberg, M.D., pain specialist (and spouse of Dr. Rachel Feinberg), to discuss possible use of a back brace for pain across her lower back.  She reported left shoulder and left elbow pain.  Dr. Feinberg noted that plaintiff was unable to use the back brace due to an infected cyst on her back.  He stated plaintiff would need an MRI of her cervical spine to obtain approval for Belbuca, a prescription opioid used to treat chronic severe pain.  Cervical spine x-rays showed slight elevation of the left

scapula, cervical lordosis, slight retrolisthesis of C3 on C4, and some endplate changes at C6-C7.  (Tr. 1087-88.)

On July 15, 2017, plaintiff saw Dr. Curfman.  Plaintiff reported no improvement after her first round of Botox injections and that she was unable to drive because of motion sensitivity.  (Tr. 689-90.)

Plaintiff saw Dr. Rachel Feinberg on August 8, 2017.  Dr. Feinberg noted that plaintiff had a forward head carriage, thoracic kyphosis, and lumbar lordosis. She had positive compression testing over the cervical spine, multiple trigger points throughout her cervical region, tenderness over the cervical vertebrae and, muscular tenderness at the ligament attachment, consistent with spinal enthesopathy, or disorder of the entheses, the connective tissues between bones and tendons or ligaments.  Spurlings Maneuver, a neck compression test, was positive bilaterally.  (Tr. 1082.)

During an August 8, 2017 appointment with Dr. Rifkin, plaintiff had a depressed affect and mood with fair insight and judgment.  Dr. Rifkin prescribed Rexulti, an anti-depressant, and continued her other medications.  (Tr. 722-24.)

On August 8, 2017, plaintiff received a third Botox injection.  She reported that although she continued to have daily headaches, she felt they were less severe with the injection.  She also reported feeling sick for a few days after the injection.  (Tr. 685.)

At a September 5, 2017 appointment with Dr. Rachel Feinberg, plaintiff  reported pain with radiation into the left arm and left leg pain that radiated down from her lower back to her foot.  She had a slightly antalgic or limping gait to the left, positive straight leg raises on the left side, positive compression testing of the left cervical spine with slumped sitting and a slightly pendulous abdomen.  (Tr. 1077.)

Plaintiff saw Dr. Rifkin on September 6, 2017.  He documented a depressed mood and affect with fair insight and judgment.  He recommended Rexulti, and to continue her same medications.  (Tr. 720-22.)

On October 6, 2017, plaintiff saw Dr. Rukhman with complaints of low energy, increased anxiety, and difficulty sleeping. (Tr. 1344.)  She also saw Gregory McLennan,

M.D., a urologist, at Mercy Cancer Center for urinary urgency and urge incontinence.  His notes state she was very resistant to following his recommendations since he had met her, including taking the medications he previously gave her.  Plaintiff was instructed to try the medications and that she would need urodynamic testing in the future if her symptoms continued. (Tr. 765-66.)

At an October 18, 2017 appointment with Dr. Rifkin, plaintiff reported increased depression and that she was isolating herself from her friends.  She also reported migraines with shooting pain into her back, head, and left shoulder.  She was not able to keep up with dishes and laundry because of pain.  She had a depressed affect and mood with fair insight and judgment.  Dr. Rifkin increased Rexulti and continued her other medications.  (Tr. 718-20.)

During an October 19, 2017 appointment with Dr. Rachel Feinberg, plaintiff reported increased depression, fatigue, and shooting pain in her back, left shoulder, left arm, bilateral lower extremities, and bilateral hips, left worse than right.  On exam, plaintiff was slumped to the right in her seat, exhibited a depressed mood, had a shuffled gait, difficulty with transfers, and a positive compression test of the cervical spine, left greater than right. (Tr. 1072.)

On November 8, 2017, plaintiff saw Dr. Rukhman.   She reported she was not doing well.  She had low energy, was tired all the time, and was recently diagnosed with narcolepsy and started on Provigil, used to treat narcolepsy.   She reported she was in a lot of pain all of the time.  Dr. Rukhman ordered additional testing for potential autoimmune disease or adrenal insufficiency.  (Tr. 760-64.)

On November 13, 2017, she saw Amanda Dehlendoft, M.D., a rheumatologist, for fatigue and itching.  She had 12/18 tender points for fibromyalgia.  She was advised to discuss the possibility of small fiber neuropathy with her neurologist and continue looking into Mayo Clinic rehab.  (Tr. 1246)

On November 29, 2017, plaintiff saw Dr. Rifkin.  She reported fatigue that was interfering with her completing tasks.  She had a depressed mood and affect with fair insight and judgement.  (Tr. 716-18.)

On January 15, 2018, plaintiff saw Dr. Rachel Feinberg. She laid down during exam due to difficulty sitting and pain over the sacroiliac joints.  On exam, plaintiff had a positive Gainlen's maneuver, used to detect musculoskeletal abnormalities and primary-chronic inflammation of the lumbar vertebrae and sacroiliac joint.  She had positive compression testing of her sacroiliac joints and internal rotation of her hips caused pain and tenderness over the dorsal sacroiliac ligaments on the left side.  Lumber spine x-rays revealed marked pelvic obliquity, asymmetry of the ilia, and sclerotic changes, left greater than right, of the sacroiliac joints.  There was slight retrolisthesis, posterior or backward slippage, of L4 over L5, slight endplate changes at L5-S1, and flexion of the thoracic/lumbar junction with degenerative changes at T10-T11 and T11-T12 to a lesser degree.  Sacrococcygeal x-ray showed the sacrococcygeal junction was extremely flexed.  Dr. Feinberg noted that plaintiff needed a bilateral sacroiliac joint injection and continued chiropractic treatment. (Tr. 1061-62.)

Plaintiff saw Dr. Rifkin again on January 25, 2018, and her condition remained unchanged.  (Tr. 715-16.)

On February 8, 2018, Dr. Rachel Feinberg administered bilateral sacroiliac joint injections.  On exam, plaintiff had positive Patrick's sign, used to evaluate hip and sacroiliac pathology, and positive Gainlen's, with hypersensitivity over both sacroiliac joints.  Plaintiff reported the pain was so bad she could not sit or lay down to sleep and had increased pain when going from sitting to standing.  She received bilateral sacroiliac joint injections. (Tr. 1055.)

At a February 13, 2018 appointment with Dr. Rachel Feinberg, plaintiff complained of excruciating tailbone pain.  An x-ray showed a fracture.  Dr. Feinberg ordered an MRI of the pelvis and coccyx.  (Tr. 1051.)  Plaintiff was also seen by Dr. Curfman's office and

reported 5-15 migraines a month with mild headaches the other days. She had some improvement with Botox treatment. (Tr. 687.)

At a February 20, 2018 visit with Dr. Rachel Feinberg, plaintiff complained of head, neck, upper back, left arm, lower back, bilateral hip, and bilateral shoulder pain. Plaintiff reported that her pain increased with daily activities, prolonged sitting, dressing, laundry and with washing dishes. Plaintiff had tenderness over the sacrococcygeal joint and sacroiliac joint, left greater than right. Dr. Feinberg administered a sacrococcygeal joint injection. (Tr. 1043, 1046.)

Plaintiff saw Dr. Rachel Feinberg on March 8, 2018, for stabbing, aching, throbbing, burning pain in the head, neck, upper back, bilateral shoulders, left arm, lower back and bilateral hips. She reported that all household chores and bending over increased her pain, while ice and stretching decreased the pain. On exam, plaintiff had tenderness over the sacrococcygeal joint and received an injection at that site. (Tr. 1038, 1041.) She also saw Dr. Rukhman for very low energy and wanting to sleep all the time even while taking Provigil. Dr. Rukhman believed that her fatigue and weakness could be caused by an autoimmune disease, that not all her symptoms were caused by her thyroid, and that she needed to see a psychiatrist. (Tr. 749, 753.)

On March 29, 2018, plaintiff saw Dr. Barry Feinberg for complaints of neck, left shoulder, lower back, bilateral hip, and left knee pain. Plaintiff reported activities of daily living worsen her pain. Her diagnoses included sacroiliitis, low back pain, and sacrococcygeal joint pain. (Tr. 1033, 1036.)

Plaintiff was seen on April 4, 2018 for a preoperative evaluation with Kristin A. Scullin, M.D., for surgery on her coccyx or tailbone. The surgery was indicated due to angulated region from hypermobility and pain with sitting. She was cleared for June 7, 2018 surgery. (Tr. 1372.)

On May 4, 2018, she received a Botox injection from Dr. Curfman for her migraine headaches. (Tr. 1913.)

On May 25, 2018, plaintiff had a rheumatology follow up with Dr. Dehlendorf for diffuse pain and severe fatigue.  Dr. Dehlendorf did not have anything else to offer for her chronic pain as she had failed multiple medication trials.  The doctor suggested plaintiff continue looking into the Mayo Clinic and other medications.  (Tr. 1242-44.)

On June 4, 2018, she was seen for follow up for urge incontinence with Dr. McLennan.  Her chief complaint was urinary hesitancy.  (Tr. 1380.)

On July 2, 2018, she saw Dr. Rachel Feinberg, reporting that she had about 1/8 of her coccyx removed.  She was diagnosed with sacrococcygeal pain and sacroiliitis, and her medications were continued.  (Tr. 1817.)

On August 6, 2018, plaintiff saw Dr. Rachel Feinberg.  She had increased headaches, positive compression test on the left greater than right in the cervical spine, forward head carriage and thoracic kyphosis, and was slightly slumped to avoid pressure on the side that she had had surgery.  She continued to have problems sleeping.  An x-ray of the cervical spine documented slight right cervical tilt, and slight spurring at C5-C6 with decreased disc space height posteriorly.  Dr. Feinberg refilled plaintiff's medications.  (Tr. 1812.)

On August 7, 2018, she underwent a Botox injection with Dr. Curfman for migraine headaches.  (Tr. 1911.)  On September 12 and October 11, 2018, Dr. Rachel Feinberg refilled plaintiff's medications.  (Tr. 1802, 1806.)

On October 18, 2018, she saw Robert Bell, M.D., orthopedic surgeon, for a hand injury after falling down stairs.  She had received a splint at Urgent Care, but continued to report throbbing, constant, aching pain, decreased motion, and difficulty sleeping due to swelling and pain.  An x-ray showed an avulsion fracture of the radial collateral ligament at the base of the right ring finger and her finger was put in a splint.  She saw Dr. Bell for follow up on October 25, 2018.  (Tr. 1681-82, 1685.)  On November 11, 2018, she saw Dr. Bell again who noted her finger fracture was healing nicely and referred her to occupational therapy.  (Tr. 1691.)

On October 31, 2018, Dr. Curfman administered a Botox injection.  (Tr. 1909.)

- 12 -

On November 8, 2018, plaintiff saw Dr. Rachel Feinberg for right hand and wrist pain.  On exam she had decreased range of motion and pain in the right wrist and fingers.  Her medications were continued.  (Tr. 1796-98.)

On December 6, 2018, plaintiff saw Dr. Bell.  Her finger was still a little stiff with some pseudo rotation allowing the small finger to get underneath it and some soft tissue swelling.  She was advised to continue therapy. (Tr. 1696.)  She also saw Dr. Rachel Feinberg that day with forward head carriage, kyphosis, and lumbar lordosis. (Tr. 1794.)

On December 19, 2018, she saw Dr. Rukhman for continued fatigue, cold intolerance, constipation, and very low energy.  Her medications were continued, and she was advised to follow up with a psychiatrist. (Tr. 1386, 1393.)

Plaintiff saw Dr. Bell on January 8, 2019 for follow up.  She had made good progress, but was still lacking about 10 degrees extension that was gradually improving with a splint.  She was instructed to continue therapy for three weeks and use the extension splint to help limit mild flexion contracture due to swelling.  (Tr. 1700.)

Plaintiff saw Dr. Feinberg on January 9, 2018, for follow up on continued pain in the neck, head, hip, knee, and tailbone. On exam she was hypermobile with recent coccygectomy, surgical removal of the coccyx with some benefit.  She still felt sleepy all the time and the doctor noted forward head carriage, kyphosis, and lumbar lordosis.  (Tr. 1790.)

On January 28, 2019 she saw Dr. Curfman and requested trying calcitonin gene-related peptide (CGRP) inhibitors, a new class of drugs to treat migraines, because Botox was not working.  She elected to start Emgality, a once monthly CGRP inhibitor.  (Tr. 1906.)

On February 5, 2019, she had a final visit with Dr. Bell for her finger fracture.  She was doing great and was told to finish a couple more therapy visits and then engage in a home program.  (Tr. 1704.)

On February 21, 2019, she saw Brendan P. Lucey, M.D., neurophysiologist specializing in sleep medicine, for evaluation of possible sleep apnea.  Plaintiff reported

- 13 -

she woke up 2-3 times a night due to pain, and that it took her from 20 minutes to several hours to fall back asleep. When she could not fall back asleep, she would turn the light off and listen to audio books. She reported taking daily naps lasting 1-3 hours. She also reported waking up unrefreshed and was liable to doze unintentionally while in sedentary situations. Her excessive daytime sleepiness affected her work. She also reported being in a car accident when she dozed off while driving. Her Epworth Sleepiness Scale was 19/24, indicating abnormally high sleepiness. She was diagnosed with hypersomnolence, insomnia, and possible narcolepsy. The plan was to get testing, continue Provigil, and not drive. (Tr. 1862-63, 1869-70.)

On February 28, 2019, plaintiff saw Dr. Feinberg and her medications were continued. (Tr. 1786.)

On March 11, 2019, plaintiff saw Isabel Hartig, nurse practitioner, for rheumatology follow up with complaints of fatigue, dryness, finger discoloration, joint pain, back pain, joint stiffness, morning stiffness, and muscle weakness. On exam plaintiff had 18/18 fibromyalgia tender points. Plaintiff was referred for a biofeedback pain program, for physical therapy to treat her fibromyalgia, and to a psychologist. (Tr. 1239-40.)

On March 14, 2019, plaintiff underwent a pain psychology initial assessment with Sarah K. Buday, Ph.D., clinical psychologist. Dr. Dehlendorf had referred her for a psychological assessment related to fibromyalgia and mood difficulties. Her mood was low and anxious and she spent a lot of time in bed. She had thoughts of not wanting to wake up, but no active suicidal ideation. Dr. Buday recommended cognitive behavior therapy to help her manage her pain and mood. (Tr. 1897-99.)

On March 20, 2019, plaintiff underwent polysomnography that did not show evidence of significant obstructive sleep apnea. She was diagnosed with hypersomnia, which is excessive daytime sleepiness or excessive time spent sleeping. (Tr. 1469.)

On March 21, 2019, she saw Dr. Buday reporting she had not been well and did not want to get out of bed. This was the first time she had left her house since her last appointment. Her mood was very low, tearful, depressed, and suicidal. Her affect was

- 14 -

restricted, and she had thoughts of not wanting to be here and no sense of purpose.  The plan was for plaintiff to get out of bed 5 of the next 10 days, shower 5 times, change clothes 5 times, leave her house 3 times, open the curtains daily, and go outside 5 times for fresh air.  (Tr. 1895-96.)

On March 26, 2019, plaintiff saw Dr. Rifkin.  She reported lacking energy to do things and that she could barely complete tasks without laying down and sleeping.  She needed to rest after doctor's appointments and reported having suicidal thoughts.  Exam revealed a depressed mood and affect, fair insight and judgment and passive suicidal/homicidal thoughts.  The doctor increased Wellbutrin, reduced Fluoxetine, and continued her other medications.  (Tr. 1673-75.)

On March 28, 2019, plaintiff returned to Dr. Feinberg for follow up and medication refills.  (Tr. 1782.)  On April 25, 2019, she saw Dr. Feinberg with ongoing pain.  She had forward head carriage, sat slumped in the chair, and her shoulders rotated anteriorly or towards the front.   Her medications were continued.  (Tr. 1778.)

In an April 2019 Function Report, plaintiff reported, among other things, that she was unable to sit, stand, or walk more than 30 minutes at a time, that pain and chronic fatigue cause her to need to lay down frequently throughout the day, and that she rarely leaves her home for more than an hour due to fatigue.  She reported difficulty sleeping, attending social events, handling stress and changes in routine; that dressing is painful; and that her husband prepares all meals and performs all household chores.  She further reported that her impairments affect her ability to lift, reach, squat, bend, kneel, walk further than two blocks, climb stairs, see, remember, complete tasks, follow instructions, and concentrate for longer than an hour.  She reported that her medications cause her to experience side effects that include anxiety, difficulty sleeping, irritability, drowsiness, tiredness, dizziness, coordination problems, changes in vision, confusion, difficulty concentrating, memory problems, speech and language problems, fatigue, nervousness, headaches, and light sensitivity.  She also reported extremely limited ability to care for her children and a pet with help, and do laundry and dishes.  She could perform most personal

- 15 -

care without assistance and meet her children at the bus.  She seldom or never shops in stores, goes out to eat or socializes.  (Tr. 233-37.)

Plaintiff saw Dr. Buday on April 10, 2019.  She reported she got out of bed 7 out of 10 days, showered 7 times, and left her house 7 times.  However, she was in bed for most of the past week and did not attend a planned Cardinals game due to fatigue and a migraine. (Tr. 1892.)

On May 7, 2019, plaintiff saw Dr. Curfman for her migraine headaches.  She had not improved after three months on Emgality, used to treat migraines, and had four weeks of worsening migraines that did not respond to Medrol dose pack.  A Botox injection was administered that day.  (Tr. 1902-04.)

On May 8, 2019, plaintiff saw Dr. Buday for therapy.  She had worsening migraines, loss of vision, and balance issues.  They focused on tracking, a technique used to gain an understanding of the interactive patterns in which a presenting situation is embedded, and in making small moves each day to ease back into life.  (Tr. 1890.)

On May 9, 2019, she saw Dr. Rifkin, reporting that she was taken off Botox but had a migraine for the past three weeks and therefore needed to resume it.  She was struggling with depression but reported that her new therapist at Washington University was helpful. Her Rexulti was increased, and other medications continued.  (Tr. 1672.)

Plaintiff was hospitalized at Mercy Hospital May 26, 2019, for gallbladder inflammation with stones after being seen in the emergency room for constant, stabbing left upper quadrant abdominal pain for 5 days.  She had associated nausea, vomiting and diarrhea. She underwent laparoscopic cholecystectomy, i.e., surgery to remove the gall bladder, and was discharged May 30, 2019.  (Tr. 1428.)

On June 4, 2019, plaintiff saw Dr. Buday with a poor mood and continued pain.  She reported her mood was "ok."  They discussed how to manage her chronic pain, depression and anxiety more effectively, specifically, how to pace daily activities.  (Tr. 1887-88.)

Plaintiff saw Dr. Buday on June 13, 2019.  She reported she was not eating much and had trouble showering due to pain.  She walked slowly and reported that her mood was

- 16 -

"not very good because I haven't been feeling good."  They spent time discussing positive things in her life.  (Tr. 1884-85.)

On June 20, 2019, plaintiff saw Dr. Feinberg for ongoing pain.  Her pain was 7/10. Daily activities continued to increase her pain.  Her medications were continued.  (Tr. 1774-75.)

On July 1, 2019, plaintiff was seen in the Gastroenterology Clinic at Mercy Hospital to establish care for irritable bowel syndrome and GERD.  She reported that she passed out in the shower that morning.  (Tr. 1447.)  She was encouraged to go to the emergency room for evaluation of syncope or fainting.  She reported to the hospital the next day after she again blacked out in the shower.  She described neck pain and tightness that radiated down her arms.  She also reported dizzy spells and blacking out in the shower.  She reported that if she lifted her head upward for a certain amount of time, she would get dizzy, and her vision would go dark.  (Tr. 1455.)  The doctor was unclear of the cause but believed it was oversedation and/or blood pressure.  She was scheduled to wear a Holter monitor.  (Tr. 1460.)

On July 2, 2019, she underwent a cystourethroscopy, a procedure to visually examine the inside of the bladder and urethra, for urge incontinence.  The doctor could not recommend any other treatment as she had not tried any of his previous recommendations for controlling her symptoms.  (Tr. 1464-65.)

On July 9, 2019, plaintiff saw Dr. Feinberg for follow up and medication refill.  She complained of neck, head, left shoulder, tailbone, left hip, mid and low back, and left knee pain that increased with daily activity.  She had difficulty sleeping.  Her medications were continued.  (Tr. 1769.)

During July 12, 2019 therapy with Dr. Buday, plaintiff reported that she was tired of not feeling good and would be better if she did not have to deal with it all.  (Tr. 1882.)

On August 1, 2019, plaintiff resumed Botox injections with Dr. Curfman.  (Tr. 1900.)

- 17 -

During August 15, 2019 therapy with Dr. Buday, plaintiff reported that she had been to the Ozarks and Michigan but had a migraine for two days at the Ozarks and missed one day in Michigan due to pain.  A week earlier she also had a tire blow out on her car that jolted her body and caused increased pain.  She had a tearful mood and constricted affect. (Tr. 1879.)

In August 19, 2019 correspondence, Therese J. Booth, Ph.D., a psychologist, outlined her treatment of plaintiff from August 16, 2018, through January 9, 2019.  Her treatment included 6 visits to assist plaintiff in coping with depression.  Ms. Booth reported that plaintiff did not seem to be managing her symptoms of severe depression despite medication compliance.  Plaintiff reported great difficulty with household tasks, driving, walking, and having energy to contribute at home.  (Tr. 1678.)

Plaintiff saw Dr. Buday on August 20, 2019.  She had an anxious and tearful mood and a blunted and constricted affect.  They used cognitive behavioral therapy to help plaintiff learn how to manage her chronic pain, depression, and anxiety more effectively. (Tr. 1877-78.)

## ALJ HEARING

On August 27, 2019, plaintiff appeared and testified to the following before an ALJ. (Tr. 29-46.)  She has a master's degree in special education and a bachelor's degree in speech pathology and audiology.  Prior to November 2016, she was having severe chronic migraines, chronic fatigue, as well as depression and anxiety, so she was not able to be consistent on job attendance.  She was absent from work more than half of the month.  She has a headache every single day and breakthrough migraines at least once a week.  Her migraines can last up to several days.  She cannot tolerate light or sound and she gets nauseated and dizzy.  She sees a psychotherapist who specializes in pain, and who helps her deal with her chronic pain, as well as the depression and anxiety cycle that go with it. (Tr. 35-40.)

A vocational expert also testified at the hearing.  The vocational expert testified that a hypothetical individual at the sedentary level with limitations that would become plaintiff's RFC could not perform plaintiff's past relevant work.  The individual could, however, perform other work in the national economy such as addresser, document preparer, or tube operator.  (Doc. 41-43.)

## DECISION OF THE ALJ

On November 27, 2019, the ALJ issued a decision finding that plaintiff was not disabled.  (Tr. 10-22.)  At Step One, the ALJ found that Plaintiff worked after her alleged onset of disability, but that the work did not rise to the level of substantial gainful activity. At Step Two, the ALJ found Plaintiff had the following severe impairments:  migraine headaches; fibromyalgia; degenerative joint disease in her left hip and left knee; degenerative disc disease; sacroiliitis; Epstein Barr syndrome; major depressive disorder; generalized anxiety disorder; and posttraumatic stress disorder (PTSD).  At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, Subpart P, Appendix 1.  (Tr. 12-13.)

The ALJ determined that plaintiff had the RFC to perform sedentary work as defined under the regulations with the following limitations:

> [S]he [] can never climb ropes, ladders, or scaffolds; can only occasionally climb ramps and stairs, balance (as defined in the DOT and SCO), stoop, kneel, crouch, and crawl; should never be exposed to unprotected heights or hazardous machinery; should never have concentrated exposure to vibration; should never have concentrated exposure to loud noise (defined as a 4 or 5 in the SCO); should never have concentrated exposure to bright light, defined as light brighter than a standard office environment; is limited to learning, remembering, and carrying out only simple, routine tasks; is limited to using reason and judgment to make only simple, routine work-related decisions; is limited to working at an appropriate and consistent pace while performing only simple, routine tasks; is limited to completing only simple, routine tasks in a timely manner; is limited to ignoring or avoiding distractions while

performing only simple, routine tasks; must have only minimal changes in job setting and duties; is limited to working close to or with others without interrupting or distracting them while performing only simple, routine tasks; is limited to sustaining an ordinary routine and regular attendance at work while performing only simple, routine tasks; is limited to working a full day without needing more than the allotted number or length of rest periods during the day while performing only simple, routine tasks; should have no contact with the general public; should have only occasional contact with coworkers and supervisors; and is limited to jobs that require no fast paced production work.

(Tr. 15.)  The ALJ concluded plaintiff could not return to her past relevant work.  (Tr. 20.) At Step Five, with the VE testimony, the ALJ concluded there were sedentary unskilled jobs that exist in significant numbers in the national economy that plaintiff can perform, including addresser, document preparer, and tube operator.   Accordingly, the ALJ concluded that plaintiff was not disabled under the Act.  (Tr. 22.)


## GENERAL LEGAL PRINCIPLES

In reviewing the Commissioner's denial of an application for disability insurance benefits, the Court determines whether the decision complies with the relevant legal requirements and is supported by substantial evidence in the record. *See* 42 U.S.C. 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  The review considers not only the record for the existence of substantial evidence in support of the Commissioner's decision. It also takes into account whatever in the record fairly detracts from that decision. *Cox v. Apfel,* 160 F.3d 1203, 1207 (8th Cir. 1998).  We may not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because the

Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process); *Pates-Fires,* 564 F.3d at 942.

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). *Id.* § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to do so. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## DISCUSSION

Plaintiff asserts the ALJ erred (1) in evaluating her pain, specifically as it relates to her fibromyalgia; and (2) in formulating her RFC. This Court agrees.

### Pain Evaluation

Plaintiff argues the ALJ erred in her pain evaluation, specifically as it relates to her fibromyalgia. She argues that her activities of daily living (ADLs) are the only evidence

that the decision cites for support that the plaintiff's pain and limitation are not as severe as alleged.  She argues the decision references only the portions of the function report that support the ALJ's findings, resulting in a mischaracterization of the evidence.  She states that her very minimal and sporadic ADLs are not inconsistent with her testimony of disabling pain and fatigue.  She states that other than ADLs, there is no further discussion of the *Polaski* factors or any inconsistencies that support the decision to disregard plaintiff's subjective statements regarding pain and fatigue.  She argues the decision also lacks proper consideration of the duration, frequency and intensity of pain, and of the precipitating and aggravating factors associated with plaintiff's pain and migraine headaches.

In short, plaintiff argues the decision fails to identify any inconsistencies in the record that support the ALJ's decision to discredit plaintiff's testimony regarding pain and fatigue.  She argues that because the decision fails to consider the *Polaski* factors in combination with failing to site to inconsistencies in any particular evidence regarding her pain and fatigue, the decision is not supported by substantial evidence.

Plaintiff also argues the ALJ improperly evaluated her fibromyalgia.  She states that the decision notes that physical exam results are almost entirely normal throughout the record generally showing normal strength, coordination, sensation, reflexes, and normal range of motion with no edema. (Tr. 17.)  She argues that while this is true, the symptoms outlined by the ALJ are not normal findings suggestive of fibromyalgia.  She points out that this statement by the ALJ is the only discussion of fibromyalgia in the decision, despite consistent, ongoing complaints of generalized pain all over.  Specifically, the record evidence consistently documents positive tender points, which is an appropriate way to diagnose the condition.  (Tr. 1250, 1246, 1240.)

Defendant counters that the ALJ carefully considered plaintiff's allegations and credited them to at least some degree because a limitation to sedentary work is a significant limitation and because the ALJ listed other significant limitations.  Defendant also contends

the ALJ clearly recognized her fibromyalgia diagnosis because he found it to be a severe impairment.

The Court agrees with plaintiff. Fibromyalgia has been described as "pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling" and "often leads to a distinct sleep derangement which often contributes to a general cycle of daytime fatigue and pain." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (citing *Cline v. Sullivan*, 939 F.2d 560, 563, 567 (8th Cir. 1991)). The court further described fibromyalgia as a "degenerative disease which results in symptoms such as achiness, stiffness, and chronic joint pain." *Id.* at 590, citing *Cline,* 939 F.2d at 567.

In this case the ALJ failed to properly consider the symptoms and limitations resulting from fibromyalgia, and instead found that physical exam results showing normal strength, coordination, sensation, reflexes, and normal range of motion with no edema indicated less pain than alleged. This is inconsistent with case law. The Court also agrees that the ALJ mischaracterized plaintiff's April 2019 Function Report. Accordingly, the case is remanded for further consideration of how pain from fibromyalgia, as well as from migraine headaches, affects plaintiff's functioning.

**Residual Functional Capacity**

Plaintiff takes issue with the ALJ's evaluation of two opinions, the prior administrative medical findings of J. Ed Bucklew, Ph.D., the state agency psychological consultant, and the prior administrative medical findings of Michael O'Day, D.O., the State agency medical consultant. Because plaintiff filed her application in 2018, the revised regulation that governs the evaluation of opinion evidence applies in this case. 20 C.F.R. § 404.1520c. Under the revised regulations, courts have held that ALJs can find prior administrative findings, such as Drs. Bucklew's and O'Day's, more persuasive than other opinions. *See McCoy v. Saul*, No. 4:19-CV-00704-NKL, 2020 WL 3412234, at *9 (W.D. Mo. June 22, 2020) (ALJ properly considered the prior administrative findings and found them more persuasive than the other opinions as the regulation allows); *see also Morton v.*

- 23 -

*Saul*, No. 2:19-CV-92 RLW, 2021 WL 307552, at *8 (E.D. Mo. Jan. 29, 2021) ("While plaintiff asserts the ALJ improperly relied on Dr. Rosamond's opinion (ECF No. 13 at 18-19), the new regulations require the ALJ to consider the opinions of state agency medical consultants because they are highly qualified and experts in Social Security disability evaluation.").   *See* 20 C.F.R. § 404.1513a.  The new regulation requires that the ALJ explain how persuasive the opinion or finding was, and that the ALJ must explain how the supportability and consistency factors were considered.  See 20 C.F.R. § 404.1520c.  The ALJ may, but is not required to, explain how he or she considered the other remaining factors, unless the agency, i.e., the ALJ, finds that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported and consistent with the record, but not identical.  20 C.F.R. § 404.1520c(b)(3).

 To the extent that plaintiff is arguing the RFC finding must be supported by a specific medical opinion, plaintiff is incorrect.  Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.  However, there is no requirement than an RFC finding be supported by a specific medical opinion.  *See Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

The ALJ must reevaluate plaintiff's RFC with additional discussion explaining how the evidence supports the conclusion, specifically addressing consistency and supportability.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded for reconsideration of plaintiff's application for disability insurance benefits.  An appropriate Judgment Order is issued herewith.


 **/s/ David D. Noce**
 **UNITED STATES MAGISTRATE JUDGE**

Signed on January 28, 2022.